# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF LOUISIANA

**RICHARD LAVIOLETTE**                          **CIVIL ACTION**

**VERSUS**                                                **NO. 08-3538**

**STATE OF LOUISIANA**                        **SECTION "F" (6)**

## REPORT AND RECOMMENDATION

This matter was referred to the United States Magistrate Judge for the purpose of conducting hearings, including an evidentiary hearing, if necessary, and submission of proposed findings and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B) and (C), and as applicable, Rule 8(b) of the Rules Governing Section 2254 Cases.

Upon review of the entire record, the court has determined that this matter can be disposed of without an evidentiary hearing. *See* 28 U.S.C. § 2254(e)(2). Accordingly, it is recommended that the petition be **DENIED WITH PREJUDICE.**

# I. PROCEDURAL HISTORY[1]

On December 5, 2002, the Jefferson Parish Grand Jury issued an indictment charging petitioner with first degree murder, a violation of La. R.S. 14:30. Christopher Arceneaux (Arceneaux) was charged as a co-defendant in the same indictment. Petitioner was arraigned on December 9, 2002, and pled not guilty.

On January 27, 2003, defense counsel filed a motion to appoint a sanity commission, alleging petitioner was not competent to stand trial. The trial court granted the motion on January 29, 2003, and appointed a sanity commission. The court held a competency hearing on May 7, 2003. After hearing the testimony of Drs. Richard Richoux and Rafael Salcedo, the court found petitioner was competent to stand trial.

On February 27, 2003, petitioner filed a Motion to Sever Parties on the Basis of Antagonistic Defenses. The trial court granted the motion on June 5, 2003. Petitioner filed a Motion to Suppress Statements on January 17, 2003. He filed an Amended Motion to Suppress Statements on January 27, 2003. On September 3, 2003, those motions were heard and denied on September 9, 2003. Petitioner applied to the Louisiana Fifth Circuit Court of Appeal for supervisory writs, challenging the trial court's ruling. The state appellate court denied writs. *State v. Laviolette,* 03-1172 (La. App. 5th Cir. 2003) (unpublished

---

[1] A portion of the procedural history was taken from the following Louisiana Fifth Circuit Court of Appeal opinion: *State v. Laviolette,* No. 06-KA-0092, 943 So.2d 527 (La. App. 5 Cir. 2006).

opinion).

On April 1, 2004, the State amended the indictment as to petitioner only. The State reduced the charged offense to second degree murder (La. R.S. 14:30.1), and alleged that the murder was committed while petitioner was engaged in the attempted perpetration of an armed robbery. Petitioner was arraigned as to the amended indictment on April 6, 2004, and he pled not guilty.

Petitioner was tried by a twelve-member jury on April 19, 20, and 21, 2004. Following trial, the jury returned a verdict of guilty as charged. On May 12, 2004, petitioner filed a motion for new trial. The motion was argued and denied on June 2, 2004. Petitioner waived statutory delays, and the court sentenced him that day to a mandatory term of life imprisonment, without benefit of parole, probation, or suspension of sentence. Petitioner made a timely oral motion for appeal. He filed a written Motion for Appeal on June 22, 2004. The trial judge granted the motion on June 24, 2004.

On appeal, petitioner raised the following claims: 1) The trial court erred in allowing the State to call Christopher Arceneaux as a witness before the jury when it was known that Arceneaux would invoke his Fifth Amendment privilege against self-incrimination; and, 2) the trial court erred in denying petitioner's motion for a new trial based upon the argument that petitioner was denied his Sixth Amendment right of confrontation due to Arceneaux's refusal to testify. On September 26, 2006, the Louisiana Fifth Circuit

Court of Appeal rejected the above claims, affirming petitioner's conviction and life sentence. *State v. Laviolette*, No. 06-KA-0092, 943 So.2d 527 (La. App. 5 Cir. 2006). On May 18, 2007, the Louisiana Supreme Court denied petitioner's writ application, thereby rendering his conviction and life sentence final. *State v. Laviolette*, 957 So.2d 149 (La. 2007).

Petitioner did not seek state post-conviction relief, but rather, on May 22, 2008, filed the instant federal petition for writ of habeas corpus (rec. doc. 1), raising the same claims that he raised on direct appeal, namely: 1) That the trial court erred in allowing Christopher Arceneaux to testify before the jury when it was known that Arceneaux would invoke his Fifth Amendment privilege against self-incrimination; and, 2) that the trial court erred in denying petitioner's motion for a new trial based upon the argument that petitioner was denied his Sixth Amendment right of confrontation due to Arceneaux's refusal to testify. The State acknowledges that the instant petition is timely and that petitioner has exhausted his state court remedies as required under *Rose v. Lundy*, 455 U.S. 509, 102 S. Ct. 1198, 71 L. Ed. 2d 379 (1982). (Rec. doc. 7, p. 3). Accordingly, this court shall review the pertinent facts and standard of review, then proceed to address the merits of petitioner's claims.

## II. FACTS[2]

Zaina Mansour (Zaina) testified at trial that she was fourteen years old, and she had a brother and a sister who were eight-year-old twins. On the night of October 27, 2002, Zaina and her mother, Deana Mansour (Mrs. Mansour), returned to their home at 804 Huckleberry in Terrytown after a visit with Zaina's grandmother. Mrs. Mansour parked the family's van in the driveway in front of the house, and she and Zaina began cleaning the inside of the vehicle.

Zaina testified that she was standing on the outside of the vehicle on the passenger side, cleaning the back seat. Her mother was standing outside on the vehicle's driver's side. Two young men-one black and one white-approached Zaina from behind. She testified that the two men were together. The black man grabbed her shoulder and turned her around to face him. He pointed a gun at her face and said, "[G]ive me everything you got." The white man did not say anything, but began rubbing Zaina's thigh with his hand. Zaina testified she believed she was being sexually assaulted, and she was afraid. She called out to her mother.

Mrs. Mansour crawled across the back seat of the van and put her arm around Zaina, shielding the girl with her body. Mrs. Mansour told the men to take everything she

---

[2] The facts are taken from the state appellate court's opinion, *State v. Laviolette*, No. 06-KA-0092, 943 So.2d 527 (La. App. 5 Cir. 2006).

5

had. Zaina testified that her mother tried to move her purse toward the men, offering it to them. But the men did not take anything. Mrs. Mansour said, "Zaina, call the police." The black assailant shot Mrs. Mansour, and both men fled on foot.

Zaina testified that she closed and locked the van doors and began performing CPR on her mother. She tried to call police on a cellular telephone, but the phone was inoperable. Zaina ran to the front door of the house and called to her father for help. Aref Mansour (Mr. Mansour), Zaina's father (and the victim's husband), testified that he was napping inside the house when his daughter knocked on the door. He said Zaina called police, and officers responded quickly. But by the time emergency medical technicians arrived, Mrs. Mansour was dead.

Mr. Mansour testified that police found $1,600 in cash in the van after the murder. He said that Mrs. Mansour worked in her family's business, and she often handled large sums of money.

Dr. Karen Ross, an expert in forensic pathology, testified that she performed an autopsy on the victim's body. She determined the cause of death was a gunshot wound to the chest. The doctor testified that the wound was consistent with the victim turning and shielding someone else.

Deputy Stephanie Bartolo (Deputy Bartolo), a patrol officer with the Jefferson Parish Sheriff's Office, testified the shooting call originated at 8:45 p.m., and it took her

about three minutes to arrive at the scene. Another deputy was already there. Deputy Bartolo testified that the victim was in the vehicle, slumped over the seat and bleeding profusely. Zaina, who was standing next to the vehicle, said "Help my mom. Please don't let my mom die." Deputy Bartolo testified that she attempted to administer first aid to the victim. She briefly interviewed Zaina, who described the perpetrators as a white man and a black man.

Lieutenant Grey Thurman (Lieutenant Thurman), a platoon commander with the Homicide Section, testified that his squad was assigned to the investigation. He and Detective Donald Meunier (Detective Meunier) processed the scene at 804 Huckleberry. Lieutenant Thurman testified that he grew up near the scene, and he knew there was little foot traffic from outside the neighborhood. He therefore believed that the perpetrators lived in the neighborhood.

Lieutenant Thurman testified that among the items of evidence recovered at the scene were a spent cartridge casing and a projectile from a nine millimeter semi-automatic handgun. The murder weapon was never recovered. The Mansours' vehicle was impounded, and was processed for evidence at the Detective Bureau. Detective Meunier testified that a palm print found on the rear passenger side of the victim's vehicle was determined to be that of Arceneaux. No fingerprints were found that matched petitioner's.

Detective Meunier testified that the sheriff's department received a number of

7

anonymous telephone calls from people who suggested petitioner was involved in the murder. Using computer databases, Detective Meunier found a photograph of petitioner. Petitioner fit Zaina's general description of the second perpetrator as a white or Hispanic man. Detective Meunier testified that, on October 29, 2002, he showed Zaina a photographic lineup containing a picture of petitioner, but Zaina was unable to make an identification.

Detective Meunier testified that his suspicions were further piqued by the fact that petitioner lived only three or four houses away from the Mansours. Moreover, the detective learned that Dennis Cloud (Mr. Cloud), an associate of petitioner's, had reported a nine millimeter handgun stolen from his car on October 24, 2002, while the vehicle was parked in front of petitioner's house. Based on the evidence found at the scene, the investigators believed the murder weapon was a nine millimeter handgun.

Deputy Kirk Zeagler (Deputy Zeagler) testified that he and other officers canvassed the Mansours' neighborhood on October 30, 2002, with the hope of uncovering additional information about the perpetrators. Officers went to petitioner's house and spoke with petitioner and his mother. Deputy Zeagler said petitioner's mother denied any knowledge of the murder. Petitioner did not say that he had seen either the shooting itself or the perpetrators. The deputy said that petitioner's demeanor suggested he was afraid and he found petitioner's behavior to be inappropriate.

Mr. Cloud testified, as a defense witness, that he has known petitioner for ten

years, and that he was a friend of petitioner's older brother, Michael. Prior to the murder, he visited the Laviolette house nearly every day. Mr. Cloud testified that on October 24, 2002, he parked his car in front of petitioner's house during a brief visit. He later noticed the handgun he kept in the car was missing. Mr. Cloud testified that there was not a time during the visit when petitioner could have gotten into his car without being seen. Petitioner was in his presence during his entire visit, except when he went to use the bathroom.

Mr. Cloud testified that following the murder, he met with Detective Meunier to inform him about the theft of his gun. Detective Meunier asked Mr. Cloud to help him initiate contact with petitioner. The detective testified that he asked Mr. Cloud to invite petitioner on a social outing. Officers would be stationed at a prearranged location, and they would stop petitioner and Mr. Cloud. In that way, Detective Meunier planned to make contact with petitioner, while ensuring that he would not have an opportunity to "tip off" his co-perpetrator.

The detective testified that he and several other plainclothes detectives waited on Terry Parkway in Terrytown until Mr. Cloud and petitioner approached riding Mr. Cloud's motorcycle. The officers stopped the two men, informed petitioner about the homicide investigation, and asked him to accompany them to the Detective Bureau. When they arrived there, the officers placed petitioner in an interview room. Detective Meunier testified that he advised petitioner of his *Miranda* rights, and petitioner agreed to waive his rights and

9

submit to a tape recorded interview. The interview began at 4:15 p.m. on November 1, 2002. During that interview, petitioner said he had no involvement in the murder, nor had he witnessed it. The tape recording of the interview was admitted at trial, and was played for the jury. A transcript of that recording was also admitted in evidence.

Petitioner submitted to a second tape recorded interview at 5:15 p.m. on November 1, 2002. That interview was also entered into evidence and was played for the jury. During that interview, petitioner admitted to Detective Meunier that he was with Arceneaux on the night of October 27, 2002, and that he saw Arceneaux shoot the victim. Petitioner said he did not participate in the shooting. He further claimed he was not standing close to Arceneaux when Arceneaux fired at the victim. Petitioner said that afterwards, Arceneaux held the gun to his head and threatened to kill him if he told anyone he was the shooter.

Detective Meunier testified that he arrested petitioner on November 1, 2002. The Detective testified that he showed Zaina photographic lineups containing pictures of petitioner and Arceneaux, but she was unable to make an identification. Zaina did, however, collaborate with Heather Gorman of the sheriff's office to complete a composite drawing of the black suspect.

Timothy Scanlan (Scanlan), a forensic scientist with the Jefferson Parish Sheriff's Office Crime Lab, was accepted by the trial court as an expert in firearms

examination. He testified that he examined the projectile and the copper jacket found at the scene. He determined that they were fired from a Hi-Point nine millimeter handgun.

Scanlan testified that he participated in the examination of the victim's vehicle after it was impounded. He dusted it for fingerprints and swabbed it for DNA samples. Lieutenant Patricia Adams (Lieutenant Adams) of the latent fingerprint division testified for the defense. She stated that she assisted in collecting latent fingerprints from the vehicle. She testified that of the four slides lifted, three were palm prints and the other was a fingerprint. Two of the palm prints were identified as Arceneaux's. The fingerprint was identified as belonging to the victim's sister. There was one palm print that could not be identified because it was of poor quality.

## III. STANDARD OF REVIEW

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") comprehensively overhauled federal habeas corpus legislation, including 28 U.S.C. § 2254. Amended subsections 2254(d)(1) and (2) contain revised standards of review for questions of fact, questions of law, and mixed questions of law and fact. Provided that the state court adjudicated the claim on the merits, pure questions of law and mixed questions of law and fact are reviewed under § 2254(d)(1) and questions of fact are reviewed under § 2254(d)(2). *Hill v. Johnson*, 210 F.3d 481, 485 (5th Cir. 2000).

As to questions of law and mixed questions of law and fact, a federal court

must defer to the state court's decision unless it "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). The United States Supreme Court has noted:

> § 2254(d)(1)'s "contrary to" and "unreasonable application" clauses have independent meaning. A federal habeas court may issue the writ under the "contrary to" clause if the state court applies a rule different from the governing law set forth in our cases, or if it decides a case differently than we have done on a set of materially indistinguishable facts. The court may grant relief under the "unreasonable application" clause if the state court correctly identifies the governing legal principle from our decisions but unreasonably applies it to the facts of the particular case. The focus of the latter inquiry is on whether the state court's application of clearly established federal law is objectively unreasonable, and we stressed in *Williams[ v. Taylor*, 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000)] that an unreasonable application is different from an incorrect one.

*Bell v. Cone*, 535 U.S. 685, 694, 122 S.Ct. 1843, 1850, 152 L.Ed.2d 914 (2002) (citations omitted).

As to questions of fact, factual findings are presumed to be correct and a federal court will give deference to the state court's decision unless it "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2); *see also Hill*, 210 F.3d at 485; 28 U.S.C. § 2254(e)(1).

## IV. ANALYSIS

### A. Trial Court Erred in Allowing Christopher Arceneaux to Testify

Petitioner argues that the trial court erred in allowing Christopher Arceneaux to take the witness stand in front of jurors when it was known that Arceneaux, rather than answering the prosecution's questions, would invoke his Fifth Amendment right against self-incrimination. According to petitioner, Arceneux's invocation of his Fifth Amendment right unduly prejudiced him, denying him his right to a fair trial.

In addressing this issue on direct appeal, the Louisiana Fifth Circuit Court of Appeal first examined the applicable facts. At the time petitioner's trial took place, Arceneaux had already been convicted of first-degree murder in connection with the death of Deana Mansour and the jury in his case had recommended the death penalty, but the trial court had not yet imposed the sentence. A tentative deal between Arceneaux and the State, pursuant to which Arceneaux would testify against petitioner in exchange for a life sentence, had fallen through and Arceneaux's counsel advised that if called to the witness stand in connection with petitioner's trial, Arceneaux "will invoke his Fifth Amendment privilege...." *Laviolette*, 943 So.2d at 533. In response, the prosecution opined "that Arceneaux could not refuse to testify, and that if he attempted to invoke the a Fifth Amendment privilege, the judge should inform him that he was required to answer the questions put to him." *Id*.

After considering the matter, the trial judge "ruled that the State could call Arceneaux to the stand before the jury." *Id.* However, before testimony commenced, the following exchange took place at the bench:

> MR. WALKER [defendant's counsel]:
> Your Honor, out of an abundance of caution, not knowing what's going to come out in front of the jury, I would request that this witness initially be taken out of the presence of the jury to determine whether or not he's going to testify.
>
> MR. FREESE [prosecutor]:
> No. They don't have a right to a preview of what will happen on the stand. We can call the witness and ask the witness what questions we deem appropriate, regardless of what his response is going to be.
>
> THE COURT:
> Do you want to respond?
>
> MS. GAULIN [defendant's co-counsel]:
> Under State versus Berry, it would be unethical to put a witness on the stand knowing that he will not testify. It would be very, very prejudicial, for our client, to do that.
>
> MR. FREESE:
> That is a misstatement of the law. It would be unethical for me to call a witness who I know would invoke the Fifth Amendment right that he can invoke.
>
> THE COURT:
> But the thing is he has no Fifth Amendment right at this point, because-

MR. WALKER:
> But, Your Honor, my concern is that he's going to refuse to testify, and then Mr. Freese is going to ask him questions knowing that he's not going to answer, and it's going to amount to Mr. Freese testifying through his questions.

THE COURT:
> And I won't allow that.

MR. WALKER:
> That is what I was concerned about in front of the jury.

THE COURT:
> And we're not going to go through a long list of questions. I will allow him to begin, but if that's the tact that's taken, then we'll just have to leave it at that point.

*Laviolette*, 943 So.2d at 533-534.

Following the above discussion, the prosecution called Arceneaux to the witness stand and asked him, "How old are you?" In response, Arceneaux stated, "I respectfully plead the Fifth." Thereafter, both the prosecution and the trial judge explained to Arceneaux that pursuant to the court's order, he was required to testify. The court further explained to Arceneaux that his testimony could not be used against him in any criminal prosecution except for perjury or giving a false statement. In response, Arceneaux explained that he understood what the judge was saying, but he still refused to testify. At that point, Arceneaux was excused and the judge later decided that the

15

prosecution would not be allowed to question Arceneaux further. *Id.* at 534.[3]

In addressing petitioner's claim that the trial court erred in allowing Arceneaux to invoke his Fifth Amendment privilege in the jury's presence, the Louisiana Fifth Circuit examined applicable Supreme Court law:

> In the leading case of *Namet v. United States,* 373 U.S. 179, 83 S.Ct. 1151, 10 L.Ed.2d 278 (1963), the United States Supreme Court considered the question of whether the trial court committed reversible error in allowing prosecutors to question two witnesses about whether they engaged in criminal activity with the defendant, although it was known that the witnesses were going to claim their privilege against self-incrimination. The Court held that reversible error can occur either when "the Government makes a conscious and flagrant attempt to build its case out of inferences arising from use of the testimonial privilege," *Id.* at 186, 83 S.Ct. at 1154-1155, or when "in the circumstances of a given case, inferences from a witness' refusal to answer added critical weight to the prosecution's case in a form not subject to cross-examination, and thus unfairly prejudiced the defendant." *Id.* at 187, 83 S.Ct. at 1155.

*Id.* at 535-536.

Next, the state appellate court applied the *Namet* two-part test to the applicable facts.

> Applying the *Namet* analysis, we find nothing in the record to indicate the State made a conscious and flagrant attempt to build its case

---

[3]The trial court's decision in this regard was not conveyed to jurors and, later, during deliberations, the jury sent a note to the court inquiring whether or not the judge had issued a ruling regarding Arceneaux's refusal to testify and, if so, whether they "were allowed to know the result of your ruling?" In response, the judge advised "that he would address the matter with the jurors after they completed their deliberations", but there is no evidence that the judge ever did so. *Id.*

> out of inferences arising from use of the testimonial privilege. To the contrary, it appears that the district attorney did not believe Arceneaux could assert the privilege and was of the view that he could be required to testify .... The entire matter was aired before the court and there is no evidence of prosecutorial misconduct. Second, we do not find that Arceneaux's assertion of his right not to testify added critical weight to the state's case in a form not subject to cross-examination or that it unfairly prejudiced [petitioner]. The only question asked of Arceneaux before he asserted privilege was how old he was. It is difficult to conclude that his assertion of his Fifth Amendment privilege in response to that question prejudiced [petitioner]. No further questions were asked and Arceneaux was excused. The trial judge ruled that Arceneaux could not be recalled, consistent with his earlier ruling that he would not allow the State to ask Arceneaux numerous questions, creating factual inferences, while the witness refused to answer.
>
> Defense counsel had advised the jury during opening argument that Arceneaux was the person who shot the victim and that he had been convicted of first degree murder. The State did not dispute that. Rather, it was the defense contention that [petitioner], although present at the crime, was an innocent bystander. However, [petitioner's] admission that he was with Arceneaux on the night and time of the crime and the victim's daughter's testimony that [petitioner] was not an innocent spectator but a participant, provided sufficient evidence of [petitioner's] guilt. Therefore we find the assertion by Arceneaux of his Fifth Amendment privilege was not reversible error. This assignment of error lacks merit.

*Id*. at 536.

This court finds the above represents a reasonable application of *Namet*, *supra*, to the facts of this case. Accordingly, petitioner's claim for federal habeas corpus relief is without merit.

### B. Trial Court Erred in Denying Petitioner's Motion for New Trial

Petitioner claims that the trial court erred in not granting his motion for a

new trial based upon the argument that by virtue of Arceneaux's refusal to testify, he was deprived of his Sixth Amendment right of confrontation. In addressing this issue on direct appeal, the Louisiana Fifth Circuit first examined the constitutional right at issue: "The Sixth Amendment to the United States Constitution allows an accused person in a criminal proceeding to confront any person who offers testimony against them." *Id*. Thereafter, the court concluded that petitioner had not been denied his Sixth Amendment right of confrontation, reasoning:

> [T]he prosecutor did not ask Arceneaux any substantive questions. He only asked the witness his age and then inquired whether he understood that he was required to testify. Immediately thereafter, Arceneaux was excused and not allowed to return as a witness. Accordingly, we find Arceneaux did not provide any information upon which the defense could have cross-examined him. Thus, for the reasons provided in [petitioner's] first assignment of error, as well as the fact that Arceneaux did not give testimony upon which he could be cross examined, we find no merit in the contention that the trial court erred in denying the defense motion for a new trial because [petitioner] was denied his confrontation rights. This assignment of error lacks merit.

*Id*. at 537.

This court finds the Louisiana Fifth Circuit Court of Appeal, in the above analysis, correctly identified the governing legal principle, petitioner's Sixth Amendment right of confrontation, and reasonably applied this principle to the facts of this case. Accordingly;

**RECOMMENDATION**

It is hereby **RECOMMENDED** that the application for federal habeas corpus relief filed on behalf of petitioner, Richard Laviolette, be **DENIED WITH PREJUDICE**.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within 14 days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object. 28 U.S.C. §636(b)(1); *Douglass v. United Services Auto. Ass'n*, 79 F.3d 1415, 1430 (5th Cir. 1996)(*en banc*).[4]

New Orleans, Louisiana, this __18th__ day of ____December____, 2009.

_____
LOUIS MOORE, JR.
United States Magistrate Judge

---

[4]*Douglass* referenced the previously applicable ten-day period for the filing of objections. Effective December 1, 2009, 28 U.S.C. §636(b)(1) was amended to extend that period to fourteen days.